IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

---

BLESSED CAJUNS LLC, *et al.*,

    Plaintiffs,

v.

ISABELLA CASILLAS GUZMAN, *et al.*,

    Defendants.

Civil Action No. 4:21-cv-00677-O

# DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR
## A PRELIMINARY INJUNCTION

BRIAN M. BOYNTON
Acting Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

*/s/ Christopher D. Dodge*
Christopher D. Dodge (MA Bar No. 696172)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
Tel: (202) 598-5571
Email: christopher.d.dodge@usdoj.gov

# INTRODUCTION

Congress enacted the American Rescue Plan Act ("ARPA") in March 2021 as a continuation of the federal government's efforts to provide relief to American individuals and businesses suffering the economic and public health effects of the COVID-19 pandemic. The Act allocated $28.6 billion towards a Restaurant Revitalization Fund ("RRF") to be administered by the Small Business Administration ("SBA") that could grant eligible restaurants relief equal to revenue losses caused by the pandemic. SBA began processing and disbursing RRF claims from eligible restaurants on May 3, 2021. Due to overwhelming demand from restaurants, claims on the RRF rapidly dwarfed the allocation of funds set aside by Congress and, accordingly, the SBA stopped accepting applications for the RRF on May 24, 2021, but will continue to process and pay out pending claims until the fund is exhausted.

In creating the RRF, Congress crafted a narrow plan that permitted all eligible restaurants to apply for relief but that instructed the SBA, for the first 21 days the RRF operated, to prioritize processing claims from restaurants owned by women, veterans, and socially and economically disadvantaged individuals.[1] This priority period operated from the RRF's inauguration on May 3, 2021 through May 24, 2021. But the priority period has now ended. Accordingly, while SBA is not accepting new applications, it will no longer prioritize restaurants owned by women, veterans, and socially and economically disadvantaged individuals and will instead initiate processing of claims based on the order in which they were filed, regardless of the priority status of the applicant. *See* Miller Decl. ¶¶ 2, 22-23. SBA will continue approving and disbursing claims until the RRF is exhausted or Congress provides additional funding.

Plaintiffs, two restaurants and their owners, now seek to enjoin the priority period provision

---

[1] In crafting this priority period, Congress was motivated by extensive evidence showing its prior COVID-19 relief efforts exacerbated existing inequalities between different groups of small business owners—including women and socially and economically disadvantaged restaurant owners—due to past and present discrimination within public and private lending markets. Congress also analyzed similar evidence showing that these businesses have borne an outsized burden during the pandemic due to past and present discrimination, including the lack of access to earlier COVID-19 relief funds.

of the RRF. But their claim is moot because that provision ceased operation by its own terms. The relief they seek—a process that selects applications for processing without regard to race or sex (Compl. ¶ 30)—reflects the status quo. SBA is not presently considering an applicant's status as a veteran-, woman-, or socially and economically disadvantaged individual-owned restaurant when determining which applications to process. *See* Miller Decl. ¶¶ 2, 22-23. Plaintiffs' claims are therefore moot and should be dismissed.

## BACKGROUND

### I. The American Rescue Plan and Creation of the Restaurant Revitalization Fund

On March 11, 2021, Congress enacted the American Rescue Plan Act, which provides widespread COVID-related relief to the American people and businesses, including restaurants. *See* American Rescue Plan Act, Pub. L. No. 117-2 (2021) ("ARPA").[2]

As relevant here, § 5003 of ARPA established the Restaurant Revitalization Fund ("RRF") and appropriated $28.6 billion to the fund for fiscal year 2021. ARPA § 5003(b)(1)-(2). Section 5003 makes numerous businesses eligible for an RRF grant, including those qualifying as "a restaurant, food stand, food truck, food cart, caterer, saloon, inn, tavern, bar, lounge, brewpub, tasting room, taproom" and certain other premises. *Id.* § 5003(a)(4). ARPA further explains that, subject to the prioritization scheme described below, the SBA "shall award grants to eligible entities in the order in which applications are received by the Administrator." *Id.* § 5003(c)(1). Specifically, § 5003 instructs that in the first 21 days that grants are awarded through RRF, the SBA:

> shall prioritize awarding grants to eligible entities that are small business concerns owned and controlled by women (as defined in section 3(n) of the Small Business Act

---

[2] ARPA "takes a multipronged approach to tackle the public health and economic crises resulting from the COVID-19 pandemic." H.R. Rep. No. 117-7 at 3 (2021). The House Report accompanying the bill makes clear that Congress was focused on the ways in which the nation's "most vulnerable communities are forced to bear the brunt of" both the pandemic and the resultant economic crisis "as underlying health and economic inequities grow worse." *Id.* at 2. The House Report explained that "underlying racial, wealth, social, and gender disparities are exacerbated by the pandemic," that "[w]omen – especially mothers and women of color – are exiting the workforce at alarming rates," and that "eight out of ten minority-owned businesses are on the brink of closure." *Id.* at 2. The Act is intended to "provide crucial support for the hardest-hit small businesses, especially those owned by entrepreneurs who have experienced systemic discrimination." *Id.* at 3.

>   (15 U.S.C. 632(n)), small business concerns owned and controlled by veterans (as defined in section 3(q) of such Act (15 U.S.C. 632(q))), or socially and economically disadvantaged small business concerns (as defined in section 8(a)(4)(A) of the Small Business Act (15 U.S.C. 637(a)(4)(A))).

ARPA § 5003(c)(3)(A). A business is "owned and controlled by women" if at least 51% of the business is owned by one or more women, and the management and daily business operations of the business are controlled by one or more women. 15 U.S.C. § 632(n). Similarly, a business is "owned and controlled by veterans" if at least 51% of the business is owned by one or more veterans and the management and daily operations of the business are controlled by one or more veterans. *Id.* § 632(q)(3). Under Section 8(a) of the Small Business Act, a "socially and economically disadvantaged small business concern" is at least 51% owned by "one or more socially and economically disadvantaged individuals," "an economically disadvantaged Indian tribe," or "an economically disadvantaged Native Hawaiian organization," where the management and daily business operations are controlled by the same. *Id.* § 637(a)(4)(A)).

Section 8(a) defines "socially disadvantaged individuals" as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." *Id.* § 637(5). Regulations, adopted into the RRF application, further provide that individuals who are members of the following groups are "presumed to be socially disadvantaged: Black Americans, Hispanic Americans, Native Americans (including Alaska Natives and Native Hawaiians), Asian Pacific Americans, and Subcontinent Asian Americans." *See* 13 C.F.R. § 124.103(b)(1). Under those regulations, a presumption may be rebutted with "credible evidence to the contrary," *id.* § 124.103(b)(3), and individuals who are not members of one of these groups may still be socially disadvantaged if they meet other requirements, such as having a distinguishing characteristic that has contributed to substantial social, which has limited their entry or advancement in the business world. *Id.* § 124.103(c)(1)-(2). An individual's race thus may create a presumption of social disadvantage, but individuals of any race may still experience "ethnic prejudice or cultural bias," and thus be socially disadvantaged. 15 U.S.C. § 637(5).

Because the priority period is open to "socially and economically disadvantaged" individuals, a restaurant owner who is presumptively socially disadvantaged must also be economically

disadvantaged in order to participate in the priority period. Section 8(a) defines "economically disadvantaged individuals" as "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(6)(A). On the RRF application, the SBA states that in assessing economic disadvantage, it will look at an individual's net worth, average income over the past three years, and the fair market value of the individual's assets. *See* App. 043.[3] If an individual exceeds certain thresholds on any of those three metrics, he or she "will generally be deemed not to be economically disadvantaged." *Id.* This approach largely tracks SBA regulations related to Section 8(a). *See* 13 C.F.R. § 124.104(c).

**II.     Operation Of The Restaurant Revitalization Fund And Closing Of Priority Period**

On April 19, 2021—two weeks before the RRF portal opened—SBA released official guidelines for RRF applications. *See* App. 035. The guidance reiterated that the term "[e]ligible entities" includes the various kinds of restaurants, eateries, and bars listed in Section 5003 of ARPA. *See* SBA, Restaurant Revitalization Fund – *Who can apply* (App. 041). SBA guidance explained that during the 21-day priority period "SBA will accept applications from all eligible applicants but only process and fund priority group applications." *Id.* at *When to apply*.

On April 27, 2021, the SBA announced that the RRF application portal would open on May 3, 2021, and released additional guidance advising that "[a]ll eligible applicants are encouraged to submit applications as soon as the portal opens." *See* App. 053. The guidance made clear that although SBA would prioritize processing certain applications over the program's first 21 days, after that priority processing period "all eligible applications will be funded on a first-come, first-served basis." *Id.* SBA further released a Program Guide on April 28, 2021, which explained that "SBA will accept applications from all eligible Applicants" during the priority period. App 027.[4]

---

[3] All citations to the Appendix are to the previously filed Appendix in *Greer, et al. v. Guzman, et al.*, Case No. 4:21-cv-651-O, ECF No. 10 (N.D. Tex. May 18, 2021).

[4] SBA social media accounts likewise announced that the "online application will remain open to any eligible establishment until all funds are exhausted." *See* @SBAGov (Apr. 27, 2021). *See* App. 056.

SBA began accepting applications through the RRF portal on May 3, 2021. *See* Compl. ¶ 11; *see also* Miller Decl. ¶ 10. Per § 5003 of ARPA, the opening of the RRF application process triggered the beginning of the 21-day priority period. *See* Miller Decl. ¶ 16. Consistent with those provisions, SBA began processing claims from applicants who self-certified as qualifying for priority status. *See* Miller Decl. ¶ 21.

Demand for RRF grants was immediate and overwhelming from priority and non-priority businesses alike. *See* Miller Decl. ¶ 13. On May 5, 2021, SBA reported that it had received approximately 186,000 applications in two days, with roughly an equal split between priority and non-priority businesses. *See* App. 114. That announcement indicated that the $28.6 billion pot of funds allocated by Congress was likely to be rapidly exhausted, as President Biden previously explained the funding was intended "to be able to help about 100,000 restaurants and other eligible businesses—fewer than those that already applied in the first 48 hours of the website being operational." New York Times, *Restaurants and Bars Rush to Apply for New Federal Aid Program* (May 5, 2021) (App. 117).

On May 12, 2021, the SBA reported that in the first ten days of the portal being open, "the RRF program has received more than 266,000 applications representing over $65 billion in requested funds." *See* SBA, *Recovery for the Smallest Restaurants and Bars: Administrator Guzman Announces Latest Application Data Results for the Restaurant Revitalization Fund* (May 12, 2021), https://www.sba.gov/article/2021/may/12/recovery-smallest-restaurants-bars-administrator-guzman-announces-latest-application-data-results. The SBA's press release again noted that "[n]early half of the overall submitted applications came from women, veterans, and socially and economically disadvantaged business owners," with slightly more than half coming from non-priority groups. *Id.* It explained that $29 billion of requested funds came from these priority groups, with the remaining approximately $36 billion coming from non-priority applications. *Id.*

---

SBA further offered a series of webinars in the run-up to the RRF portal's opening to assist restaurants in the application process. *See* April 27, 2021 Press Release (App. 053). Those webinars likewise made clear that "During the initial 21-day Priority Period, SBA will accept applications from all eligible Applicants." *See* SBA, *Restaurant Revitalization Fund: Learn How to Apply*, at 10:00 (https://youtu.be/fxi3EcB_BZ4?t=600).

**Defendants' Response to Plaintiffs' PI Motion – Page 5**

On May 18, 2021, the SBA announced that it had received 303,000 applications, requesting over $69 billion in funds. *See* Compl. ¶ 15, Ex. 2. It reported that of these applications, "57 percent came from women, veterans, and socially and economically disadvantaged business owners." *Id.* It further announced that SBA had approved (though not necessarily processed) 38,000 applications for more than $6 billion in funds. *Id.* SBA also announced that "eligible eating establishments have until Monday, May 24, 8 p.m. ET, to submit applications to the Restaurant Revitalization Fund." *Id.*, Ex. 2; *see also* Miller Decl. ¶ 13. The RRF application portal subsequently closed on May 24. *See* SBA, Restaurant Revitalization Award Portal ("After an overwhelming response to the Restaurant Revitalization Fund, the application portal is now closed for new applications."), https://restaurants.sba.gov/requests/borrower/login/?next=/.[5]

May 24, 2021 also was the last day SBA prioritized processing applications from claimants self-certifying as qualifying for priority status. *See* Miller Decl. ¶¶ 13, 16. Beginning on May 25, 2021, SBA began processing claims from non-priority groups—specifically, claims from restaurants constituting the smallest of the small. *See* Miller Decl. ¶ 22. On May 26, SBA will begin processing non-priority claims generally, such that new processing will begin "in the order in which applications are received by the [SBA]." *Id.* § 5003(c)(1); *see also See* Miller Decl. ¶¶ 2, 23.

### III.  Plaintiffs And This Litigation

Plaintiff Blessed Cajuns LLC, equally co-owned by Jason and Janice Smith, is a limited liability company established under the laws of Texas and doing business in Keller, Texas under the name The Lost Cajun Keller. *See* Compl. ¶¶ 3-5. Blessed Cajuns alleges it suffered lost revenue due to the pandemic and therefore applied for an RRF grant on either May 4 or May 5, 2021. *Compare Compl.* ¶ 12 (claiming application was filed on May 5) *with* Jason Smith Decl. ¶ 9 (claiming application was filed on May 4) *and* Janice Smith Decl. ¶ 9 (same). Jason Smith alleges that he is a non-veteran white male

---

[5] As of May 23, 2021, SBA had disbursed roughly $11.3 billion with approximately $17.2 billion remaining to be disbursed. *See Vitolo v. Guzman*, Case No. 21-5517, Dkt. 13 (6th Cir. May 24, 2021) (Declaration of John A. Miller, SBA Deputy Association Administrator for Capital Access). SBA estimated at that time the remaining RRF funds would be disbursed in approximately 20 to 30 calendar days. *Id.*

and Janice Smith alleges she is a non-veteran white female. *See* Jason Smith Decl. ¶¶ 4-5; Janice Smith Decl. ¶¶ 4-5. Blessed Cajuns and its owners allege that they do not qualify for any of the priority groups under the RRF and, further, that they are not economically disadvantaged. *See* Compl. ¶ 14.

Plaintiff PSBH LLC is a limited liability company established under the laws of Pennsylvania and doing business as Penn Hotel Sports and Raw Bar in Camp Hill, Pennsylvania. *See* Compl. ¶ 6. It is owned by Plaintiff Eric Nyman, who alleges that he is a non-veteran white male. *See* Compl. ¶ 7; Nyman Decl. ¶ 4-5. Nyman alleges his restaurant suffered losses due to the COVID-19 pandemic and therefore applied for an RRF grant on May 3, 2021. *See* Compl. ¶ 13; Nyman Decl. ¶ 9.

Plaintiffs filed this action on May 23, 2021, and filed motions for a preliminary injunction and class certification later that evening and early next morning. *See* ECF Nos. 1; 4-7. Plaintiffs argue that a preliminary injunction is warranted because § 5003 prioritizes processing certain applications based on race and sex. *See* Compl. ¶¶ 18-22; PI Mem. at 5-7. In particular, they allege SBA is "discriminating [against them] on account of race and sex in administering the Restaurant Revitalization Fund." Compl. ¶ 20. But as explained *infra*, the race- and sex-conscious priority period has expired by its own terms and SBA is presently selecting claims for processing, including Plaintiffs', in sequential order. The Court ordered Defendants to respond to Plaintiffs' PI motion by May 25, 2021. *See* ECF No. 10.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy. It should only be granted if the movant has clearly carried the burden of persuasion on all four . . . prerequisites. The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Cherokee Pump & Equip. Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994). "The four prerequisites are as follows: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest." *Canal Auth. Of State of Fla. V. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). These last two factors are combined when claims are brought against the government. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

I.  **Plaintiffs Are Not Likely To Succeed on The Merits of Their Claim**

To obtain a preliminary injunction, Plaintiffs must demonstrate that they are likely to succeed on the merits, including by establishing jurisdiction. *See, e.g.*, *Anderson v. Oakley*, 77 F.3d 475 (5th Cir. 1995). Plaintiffs cannot make that showing here because their claim is moot and accordingly Plaintiffs no longer have standing to pursue their complaint, to the extent they had it when their claim was filed.

"Mootness is 'the doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness).'" *Ctr. for Individual Freedom v. Carmouche,* 449 F.3d 655, 661 (5th Cir. 2006) (quoting *U.S. Parole Comm'n v. Geraghty,* 445 U.S. 388, 397 (1980)). "If a case has been rendered moot, a federal court has no constitutional authority to resolve the issues that it presents." *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 524-525 (5th Cir. 2008). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citing *Murphy v. Hunt,* 455 U.S. 478, 481 (1982) (*per curiam*)). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Id.* (quotation mark omitted). "A matter is moot 'when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (quotations omitted)).

Plaintiffs' claims are moot because the statutory provision that they challenge—the priority period subsection of § 5003—expired by its own terms approximately 24 hours after Plaintiffs filed their complaint. *Compare* ECF No. 1 with Miller Decl. ¶ 16. Claims are mooted when the government conduct they challenge expires on its own terms. The Fifth Circuit recently held in *Spell* that a pastor's challenge to a Governor's stay-at-home orders in response to the COVID-19 pandemic became moot when the "stay-at-home orders expired by their own terms." *Spell*, 962 F.3d at 179. The Fifth Circuit

concluded that "[t]he Plaintiffs' request [to] enjoin them is therefore moot." *Id.*  The court explained that the case did not implicate the rule barring Defendants from "automatically moot[ing] a case simply by ending [their] unlawful conduct once sued." *Id.* at 179 (quoting *Already, LLC*, 568 U.S. at 91). Contrary to that scenario, the automatic lapse of a rule or statute is "predetermined and thus not a response to litigation." *Id.* at 179.  "So unlike a postsuit repeal that might not moot a case, a law's automatic expiration does." *Id.* (citing *Trump v. Hawaii*, 138 S. Ct. 377, 377 (2017); *Burke v. Barnes*, 479 U.S. 361, 363-364 (1987)).  The Fifth Circuit has repeatedly applied this reasoning in recent cases challenging moot laws.  *See, e.g.*, *Amawi v. Paxton*, 956 F.3d 816, 819, 821 (5th Cir. 2020) (dismissing an appeal as moot because a statutory amendment "provided the plaintiffs the very relief their lawsuit sought"); *Veasey v. Abbott*, 888 F.3d 792, 799 (5th Cir. 2018) ("Ordinarily, a[n] [action] challenging a statute would become moot by the legislature's enactment of a superseding law.").[6]

The Fifth Circuit's decision in *Spell* is firmly rooted in Supreme Court case law.  In *Trump*, the Supreme Court initially granted certiorari to hear a challenge concerning a temporary order regarding the admission of refugees.  *See Trump*, 138 S. Ct. at 377.  But after the "provisions of the Order have 'expired by [their] own terms,' the appeal no longer presents a 'live case or controversy.'" *Id.* (quoting *Burke*, 479 U.S. at 363).  Similarly, in *Burke* the Supreme Court heard an appeal from members of Congress challenging the President's use of a "pocket-veto" over a specific bill.  *See* 479 U.S. at 362. But the "bill in question expired by its own terms on September 30, 2018, a few weeks after the Court of Appeals entered its judgment." *Id.* at 363.  The Supreme Court therefore concluded the case was moot.  *Id.*; *cf. Diffenderfer v. Central Baptist Church of Miami, Florida, Inc.*, 404 U.S. 412 (1972) (*per curiam*) (finding claim seeking declaratory relief that Florida law was constitutional moot after statute's repeal).

Nothing in Plaintiffs' complaint indicates that there is additional relief the Court can provide

---

[6] The same basic rule applies outside the context of expiring statutes or regulations as well. *E.g.*, *Orion Sales, Inc. v. Emerson Radio Corp.*, 148 F.3d 840 (7th Cir. 1998) (preliminary injunction against terminating a distributorship agreement became moot when the agreement expired by its own terms before oral argument in the court of appeals); *Kitlutsisti v. ARCO Alaska, Inc.*, 782 F.2d 800, 801 (9th Cir. 1986) (appeal from an injunction that prohibited drilling for oil unless a permit was issued was mooted by issuance of a permit.)

to Plaintiffs now that the priority period has expired and SBA has begun selecting applications for processing in sequential order, regardless of priority status. The complaint does not seek any backwards-looking relief and Plaintiffs admit that there "is no mechanism to 'claw back' this money once it is dispensed, and the defendants' sovereign immunity makes it impossible for the plaintiffs to recover damages." PI Mem. at 7. The forward-looking relief sought by the complaint includes only: (1) injunctive relief barring SBA "from implementing any race or sex preferences" in the RRF; (2) a declaration that such preferences are unconstitutional; (3) certification of a class to obtain the prior two forms of relief; (4) attorneys' fees and costs; and (5) any other relief the Court deems proper. *See* Compl. ¶ 30. Because the preferences that Plaintiffs target are no longer in operation due to the automatic expiration of the priority period, each form of relief sought is now moot. Accordingly, Plaintiffs cannot show any likelihood of success on the merits.[7]

## II.     Plaintiffs have not alleged an irreparable injury.

Showing irreparable harm requires Plaintiffs to establish they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Defendants are no longer selecting RRF applications for processing based on the priority status of the

---

[7] Plaintiffs' claims were meritless to begin with, regardless of the fact that they are now moot. Congress's adoption of the priority period in § 5003 serves at least two compelling government interests. *First*, the government has a compelling interest in ensuring that its funds spent on COVID-19 relief are equitably distributed and not disbursed in a manner that perpetuates either public or private discrimination in the lending and financial services industry. *Second*, the government has a compelling interest in supporting small businesses, including restaurants, owned by socially and economically disadvantaged individuals who, because of present and past discrimination, have borne an outsized burden of the economic harms brought on by the COVID-19 pandemic. Congress's adoption of the priority period "fit" these compelling interests. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989); *see also Greer, et al. v. Guzman, et al.*, Case no. 4:21-cv-651, ECF No. 9 at 16-23 (N.D. Tex. May 17, 2021) ("*Greer* Response"). For similar reasons, the sex-conscious aspects of the priority period also served an important government interest and were substantially related to that interest. *See Greer* Response at 23-24. Further still, because Plaintiffs by their own admission are not economically disadvantaged (Compl. ¶ 14), they lack standing to challenge the race-conscious aspect of the priority period. *See, e.g., See e.g., George v. Farmers Elec. Co-op., Inc.*, 715 F.2d 175, 178 (5th Cir. 1983) (female plaintiff "could in no way show that she was injured" where she independently would have been terminated under seniority-based provision of anti-nepotism policy).

applicant, per the automatic expiration of the priority period.  *See* Miller Decl. ¶¶ 2, 22-23.  Preliminary relief is therefore, at this stage, moot and cannot aid Plaintiffs in preventing any potential future harm.

### III.     The balance of equities and public interest favor Defendants.

A preliminary injunction at this stage cannot aid Plaintiffs and can only possibly delay desperately needed aid for thousands of American restaurants.  The House Report on ARPA, issued nearly three months ago, explained that "[a]lmost eleven months after shutdown orders and social distancing guidelines were implemented across our country, small businesses are still struggling to stay open, retain workers, and remain viable."  H.R. Rep. No. 117-7, at 457 (2021).  Critically, the report stated that in the wake of "full or partial shutdowns," "many restaurants may not survive."  *Id.*  Requiring SBA to pause disbursement of funds to comply with an injunctive order risks delaying this much-needed aid.  The public's interest in rapid disbursement of this aid dramatically outweighs providing Plaintiffs with a dead letter order.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied and, in view of the mootness of their claims, Plaintiffs' complaint should also be dismissed for lack of jurisdiction.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

*/s/ Christopher D. Dodge*
Christopher D. Dodge (MA No. 696172)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
Tel: (202) 598-5571
Email: christopher.d.dodge@usdoj.gov

Attorneys for Defendants

## CERTIFICATE OF SERVICE

On May 25, 2021, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ *Christopher D. Dodge*
Christopher D. Dodge
Trial Attorney
United States Department of Justice