IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| GREER'S RANCH CAFÉ et al., § | |
| § | |
| Plaintiffs, § | |
| § | |
| v. § | Civil Action No.  4:21-cv-00651-O |
| § | |
| ISABELLA CASILLAS GUZMAN, *in* § | |
| *her official capacity as administrator of the* § | |
| *Small Business Administration* **and United** § | |
| **States Small Business Administration,** § | |
| § | |
| Defendants. § | |

## ORDER

Before the Court are Plaintiffs' Motion for Temporary Restraining Order (ECF Nos. 5–6), filed May 16, 2021, and Defendants' Response[1] (ECF Nos. 9–10), filed May 18, 2021. Plaintiffs seek a Temporary Restraining Order ("TRO") to enjoin the Small Business Administration from distributing $28.6 billion in grants awarded to a priority group based on race or gender. Having considered the motion, briefing, and applicable law, and for the reasons set forth below, the Court **GRANTS** the motion.

**I.    BACKGROUND[2]**

Plaintiff Philip Greer ("Greer") owns and operates Plaintiff Greer's Ranch Café—a restaurant which lost nearly $100,000 in gross revenue during the COVID-19 pandemic (collectively, "Plaintiffs"). *See* Declaration of Philip Greer ¶¶ 4–5, 7, ECF No. 6-3. Greer seeks monetary relief under the $28.6-billion Restaurant Revitalization Fund ("RRF") created by the

---

[1] The Court is grateful for Defendants' counsel's expeditious and thorough briefing on the issues presented given the quick turn-around from Sunday afternoon.

[2] The specific facts set forth in the background are derived from Plaintiffs' Appendix and Defendants' Appendix. *See* ECF Nos. 6-1, 6-2, 6-3, 6-4, 10.

American Rescue Plan Act of 2021 ("ARPA") and administered by the Small Business Administration ("SBA"). *See* American Rescue Plan Act of 2021, Pub. L. No. 117-2 § 5003. Greer prepared an application on behalf of his restaurant, is eligible for a grant from the RRF, but has not applied because he is barred from consideration altogether during the program's first twenty-one days from May 3 to May 24, 2021. *See* Declaration of Philip Greer ¶¶ 9–10, ECF No. 6-3.

During that window, ARPA directs SBA to "take such steps as necessary" to prioritize eligible restaurants "owned and controlled" by "women,"[3] by "veterans,"[4] and by those "socially and economically disadvantaged."[5] *See* American Rescue Plan Act of 2021, Pub. L. No. 117-2 §

---

[3] "Small business concerns owned and controlled by women" are those in which "(1) at least 51 percent of small business concern is owned by one or more women or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women; and (2) the management and daily business operations of the business are controlled by one or more women." 15 U.S.C. § 632(n).

[4] "Small business concerns owned and controlled by veterans" are those in which "(A) not less than 51 percent of which is owned by one or more veterans or, in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more veterans; and (B) the management and daily business operations of which are controlled by one or more veterans." 15 U.S.C. § 632(q)(3).

[5] "[S]ocially and economically disadvantaged small business concern" are those "(i) which [are] at least 51 per centum unconditionally owned by . . . one or more socially and economically disadvantaged individuals, an economically disadvantaged Indian tribe (or a wholly owned business entity of such tribe), or an economically disadvantaged Native Hawaiian organization, or (ii) in the case of any publicly owned business, at least 51 per centum of the stock of which [are] unconditionally owned by . . . one or more socially and economically disadvantaged individuals, an economically disadvantaged Indian tribe (or a wholly owned business entity of such tribe), or economically disadvantaged Native Hawaiian organization" **and** "the management and daily business operations of such small business concern are controlled by one or more (i) socially and economically disadvantaged individuals . . . , (ii) members of an economically disadvantaged Indian tribe . . ., or (iii) Native Hawaiian organizations . . . ." 15 U.S.C. 637(a)(4)(A).

"Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. 637(a)(5). The SBA's regulations further define "socially disadvantaged individuals" as "those who have been subjected to racial or ethnic prejudice or cultural bias within American society because of their identities as members of groups and without regard to their individual qualities. The social disadvantage must stem from circumstances beyond their control." 13 C.F.R. § 124.103.

"Economically disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged. In determining the degree of diminished credit and capital opportunities the Administration shall consider, but not be limited

5003(c)(3)(A). ARPA incorporates the definitions for these prioritized small business concerns from prior-issued statutes and SBA regulations. *See* 15 U.S.C. § 632(n) (defining "women"); 15 U.S.C. § 632(q)(3) (defining "veterans"); 15 U.S.C. 637(a)(4)(A) (defining "socially and economically disadvantaged") (clarified, in turn, by 15 U.S.C. 637(a)(6)(A) (defining "economically disadvantaged"); 13 C.F.R. § 124.103 (defining "socially disadvantaged individuals")).

To effectuate the prioritization scheme, SBA announced that, during the program's first twenty-one days, it "will accept applications from all eligible applicants, but only process and fund priority group applications"—namely, applications from those priority-group applicants listed in ARPA. *See Restaurant Revitalization Fund*, U.S. Small Bus. Admin., https://www.sba.gov/funding-programs/loans/covid-19-relief-options/restaurant-revitalization-fund (last visited May 18, 2021). Priority-group "[a]pplicants must self-certify on the application that they meet [priority-group] eligibility requirements" as "an eligible small business concern owned and controlled by one or more women, veterans, and/or socially and economically disadvantaged individuals . . .." *See* U.S. Small Bus. Admin., *Form 3172: Restaurant Revitalization Funding* (effective Apr. 19, 2021).[6]

---

to, the assets and net worth of such socially disadvantaged individual. In determining the economic disadvantage of an Indian tribe, the Administration shall consider, where available, information such as the following: the per capita income of members of the tribe excluding judgment awards, the percentage of the local Indian population below the poverty level, and the tribe's access to capital markets." 15 U.S.C. 637(a)(6)(A).

[6] Notably, the RRF application only incorporates the race-presumption-designation language to describe socially disadvantaged individuals. *Compare* U.S. Small Bus. Admin., *Form 3172: Restaurant Revitalization Funding* (effective Apr. 19, 2021) ("Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities. Individuals who are members of the following groups are presumed to be socially disadvantaged: Black Americans; Hispanic Americans; Native Americans (including Alaska Natives and Native Hawaiians); Asian Pacific Americans; or Subcontinent Asian Americans."); *with* 13 C.F.R. § 124.103.

Just nine days into the twenty-one-day window, the SBA announced that "a total of $2.7 billion of relief funds have been distributed to 21,000 restaurants since [the Fund] opened" and that it has already received "more than 147,000 applications from women, veterans, and socially and economically disadvantaged business owners," which are "requesting a total of $29 billion in relief funds." Press Release 12-36, U.S. Small Bus. Admin., *Recovery for the Smallest Restaurants and Bars: Administrator Guzman Announces Latest Application Data Results for the Restaurant Revitalization Fund* (May 12, 2021) (available at: https://www.sba.gov/article/2021/may/12/recovery-smallest-restaurants-bars-administrator-guzman-announces-latest-application-data-results). With the prospect that the SBA may distribute the entirety of the $28.6 billion appropriated by Congress before applications from non-prioritized applicants, like Greer, are even eligible to be processed and considered, Plaintiffs sued Defendants SBA and Isabella Casillas Guzman, in her official capacity as administrator of SBA. *See* Compl., ECF No. 1. Shortly thereafter, Plaintiffs moved for a TRO, enjoining the use of race and sex preferences in the distribution of the Fund. *See* Mot., ECF Nos. 5–6. The motion is now ripe for the Court's consideration. *See* Resp., ECF No. 9.

## II. LEGAL STANDARD

Temporary restraining orders are "extraordinary relief and rarely issued." *Allbright v. City of New Orleans*, 46 F.Supp.2d 523, 532 (E.D. La. 1999). Rule 65 of the Federal Rules of Civil Procedure governs injunctions and restraining orders. A TRO is "simply a highly accelerated and temporary form of preliminary injunctive relief," which requires that the party seeking such relief establish the same four elements for obtaining a preliminary injunction. *Hassani v. Napolitano*, No. 3:09-cv-1201-D, 2009 WL 2044596, at *1 (N.D. Tex. 2009).

A preliminary injunction is an "extraordinary remedy" and will only be granted if the movant carries its burden on all four requirements. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). The Court may issue a preliminary injunction if the movant establishes (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) the balance of hardships weighs in the movant's favor; and (4) the issuance of the preliminary injunction will not disserve the public interest. *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013); *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *see also* Fed. R. Civ. P. 65; *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985) ("The decision to grant or deny a preliminary injunction is discretionary with the district court."). The movant must make a clear showing that the injunction is warranted, and the issuance of a preliminary injunction "is to be treated as the exception rather than the rule." *Miss Power & Light Co.*, 760 F.2d at 621.

The Fifth Circuit held that "[t]he party seeking [injunctive] relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted." *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (citing *Miss. Power & Light Co.*, 760 F.2d at 621). "Otherwise stated, if a party fails to meet *any* of the four requirements, the court cannot grant the TRO or preliminary injunction." *Speed v. America's Wholesale Lender*, 2014 WL 4755485 (N.D. Tex. 2014) (emphasis in original).

### III.  ANALYSIS

#### A. Substantial Likelihood of Success on the Merits

Plaintiffs contend they are substantially likely to succeed on the merits of their constitutional challenge. *See* Mot. 1, ECF No. 6. Defendants maintain that (1) "Plaintiffs lack standing to levy this challenge because by their own admission they have not yet applied for relief

funds despite being eligible to do so for weeks" and (2) "Plaintiffs' claims fail also on the merits." Resp. 1, ECF No. 9. The Court first addresses Plaintiffs' standing and then the likelihood of success as to Plaintiffs' Equal Protection Clause challenges to Section 5003's race-based and gender-based classifications.

(1) Standing

Defendants contend that Plaintiffs lack standing to bring their claims because "Greer admits that he has not yet applied for RRF funds despite his eligibility to do so." Resp. 10, ECF No. 9 (citing Compl. ¶ 9; TRO Mot. at 3). For the forthcoming reasons, the Court concludes Plaintiffs having standing to assert their claims.

Article III of the Constitution limits the exercise of the judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, ⸺ U.S. ⸺, 126 S. Ct. 1540, 1547 (2016). "The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* (citations omitted). "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "The party invoking federal jurisdiction bears the burden of establishing" that it has standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing is assessed "at the time the action commences . . . .." *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 191 (2000).

To satisfy the "irreducible constitutional minimum" of standing under Article III, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 126 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). Defendants contend that Plaintiffs cannot satisfy their burden to establish any of the three elements to show an injury-in-fact traceable to Defendants and redressable by the Court. *See* Resp. 11, ECF No. 9.

*(a) Injury-in-Fact*

Defendants maintain that "Greer has not shown an injury-in-fact traceable to ARPA because by his own admission he has not applied for RRF funds despite eligibility to do so." Resp. 11, ECF No. 9. To show injury-in-fact, a plaintiff must allege "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 126 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). To show a harm based on an allegedly unconstitutional application process, a plaintiff "must at least show that he is likely to apply . . . in the reasonably foreseeable future" if the state actor were not unconstitutionally barring him from the fruits of the application process. *Carney v. Adams*, 141 S. Ct. 493, 499–500 (2020). A plaintiff "can show this only if he is 'able and ready' to apply." *Id.* (citing *Gratz* v. *Bollinger*, 539 U.S. 244, 262 (2003); *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville*, 508 U.S. 656, 666 (1993)).

Here, Plaintiffs' election not to file an RRF grant application does not foreclose their injury-in-fact. Plaintiffs' alleged injury is the threatened unconstitutional use of racial and gender classifications explicit in Defendants' RRF grant prioritization scheme which prevents them from even being considered for an RRF grant. *See* Compl. ¶¶ 9–10, ECF No. 1. Based on the record, Greer is "able and ready" to apply; he has prepared an application on behalf of his restaurant and

is otherwise eligible to receive an RRF grant, but for the allegedly unconstitutional prioritization scheme preventing his application from being processed. *See* Declaration of Philip Greer ¶¶ 9–10, ECF No. 6-3. According to Defendants, this falls short because Greer only offers a "conclusory assertion that he would [apply.]" Resp. 14, ECF No. 9 (citing *Carney*. 141 S. Ct. at 501–02). Even accepting Defendants' premise that running for political office (the facts of *Carney*) mirrors the facts of this case, the context is clear: the evidence that Greer's restaurant lost nearly $100,000 in gross revenue during the COVID-19 pandemic and is attestation that he has prepared an application and is otherwise eligible are sufficient to suggest Plaintiffs' "actual desire" to apply for a monetary grant with the specific goal of supporting restaurants during the pandemic—like Greer's. *See Carney*. 141 S. Ct. at 501–02 ("the context suggests an abstract, generalized grievance, not an actual desire to become a judge."); *see also* Declaration of Philip Greer ¶¶ 4–5, 7; American Rescue Plan Act of 2021, Pub. L. No. 117-2 § 5003(a)(4). Thus, the Court concludes that Plaintiffs have sufficiently alleged an injury-in-fact.

    *(b) Traceability*

Defendants next object that "[e]ven if Greer claims that his present inability to obtain funds constitutes an injury, it is not 'fairly traceable to the challenged action of the defendant[s].'" Resp. 13, ECF No. 9 (quoting *Lujan*, 504 U.S. at 560). A plaintiff's "injury [must] be fairly traceable to the challenged action of the defendant" and not the "independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citation and internal alterations omitted).

Here, Plaintiffs' alleged injury is fairly traceable to Defendants' prioritization scheme. Defendants' objection suggest that Greer's own inaction is the but-for cause of his injury, but like Defendants' indictment of Greer's complaint and declaration, Defendants themselves seem to "conflate *eligibility* to apply with when his application will be *processed* based on the prioritization

scheme." *See* Resp. 12, n.4, ECF No. 9. Had Greer applied on May 3, 2021, as Defendants urge, his application would not have been processed until May 24, 2021, if at all. If Greer applies today, his application would not be processed until May 24, 2021, if at all. It's the same side of the coin. Remove the allegedly unconstitutional prioritization scheme for a moment, and only then, Defendants' but-for analysis holds true. Thus, the Court concludes that Plaintiffs' alleged injury-in-fact is fairly traceable to Defendants' prioritization scheme—and specifically to the allegedly unconstitutional racial and gender classifications in Section 5003.

### *(c) Redressability*

Finally, Defendants maintain that "any alleged injury is now unredressable because Greer has waited to apply until well-past the point where RRF funds are likely to be exhausted, including solely by other non-prioritized applicants such as himself." Resp. 11, ECF No. 9. For redressability, plaintiff must "show that it is likely, not merely speculative that a favorable decision will redress the injury-in-fact." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 342 (5th Cir. 2012).

Here, Defendants argue that because "SBA has already received over $65 billion in requested relief from restaurants as of May 12," the Court cannot redress Plaintiff's request with a TRO. *See* Resp. 15, ECF No. 9. The Court disagrees. Plaintiff filed this suit on May 13, 2021, challenging the racial and gender set asides. *See* Compl., ECF No. 1. As of that date, $29 billion had been requested by those is the SBA's preferred applicant pool. *See* Press Release 12-36, U.S. Small Bus. Admin. Assuming the Court enjoins Defendants and directs them to remove any racial and gender preferences from the prioritization scheme and to process Plaintiffs' application as of the date of the Complaint, there is a substantial likelihood that Plaintiffs could receive a portion of the $28.6 billion RRF if SBA, indeed, "award[s] grants to eligible entities in the order in which

applications are received by the Administrator." ARPA § 5003(c)(1). Even assuming Plaintiffs were placed at the bottom of that applicant pool,[7] the likelihood that some of the 147,000 priority-group applicants are ineligible for the program far exceeds the likelihood that SBA will award $28.6 billion unbounded before processing and considering Plaintiffs' application. Thus, the Court concludes that Plaintiffs' alleged injury-in-fact is fairly traceable to Defendants' prioritization scheme and is likely to be redressed by a favorable judicial decision. *See Spokeo*, 126 S. Ct. at 1548. Thus, the Court finds that Plaintiffs have standing to proceed and turns to the likelihood of success on the merits of their equal protection claims.

    (2) Equal Protection Clause Claims

Plaintiffs argue that they are likely to succeed on the merits of their constitutional challenges to SBA's prioritization scheme for RRF. *See* TRO Mot. 4, ECF No. 6. Defendants disagree, maintaining that "the RRF is appropriately tailored to meet compelling government interests." Resp. 16, ECF No. 9. For the forthcoming reasons, the Court concludes Plaintiffs are likely to succeed on the merits of their claims.

As to race-based classifications, Plaintiffs challenge SBA's implementation of the "socially disadvantaged group" and "socially disadvantaged individual" race-based presumption and definition from SBA's Section 8(a) government-contract-procurement scheme into the RRF-distribution-priority scheme as violative of the Equal Protection Clause. *See* TRO Mot. 1, ECF No. 6. Defendants argue the race-conscious rules serve a compelling interest and are narrowly tailored, satisfying strict scrutiny. *See* Resp. 16, ECF No. 9.

At the outset, the parties agree strict scrutiny applies where government imposes racial classifications, like here where the RRF prioritization scheme incorporates explicit racial

---

[7] Query whether this itself raises equal protection issues.

categories from Section 8(a). *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995); 13 C.F.R. § 124.103; U.S. Small Bus. Admin., *Form 3172: Restaurant Revitalization Funding* (effective Apr. 19, 2021); *see also DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 243–46 (D.D.C. 2012) (detailing the traditional statutory and regulatory framework of Section 8(a) to certify as business as a "small disadvantaged business" including the certification process for "socially disadvantaged" status and "economically disadvantaged" status). Under strict scrutiny, the government must prove a racial classification is "narrowly tailored" and "furthers compelling governmental interests." *Johnson v. California*, 543 U.S. 499, 505 (2005) (citation and internal quotation marks omitted).

Defendants propose as the government's compelling interest "remedying the effects of past and present discrimination" by "supporting small businesses owned by socially and economically disadvantaged small business owners . . . who have borne an outsized burden of economic harms of [the] COVID-19 pandemic." Resp. 17, ECF No. 9 (citing *Shaw v. Hunt*, 517 U.S. 899, 909 (1996); *United States v. Paradise*, 480 U.S. 149, 166 (1987); *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006)).[8] To proceed based on this interest, Defendants must provide a "strong basis in evidence for its conclusion that remedial action was necessary." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989) (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277 (1986)).

As its strong basis in evidence, Defendants point to the factual findings supporting the implementation of Section 8(a) itself in removing obstacles to government contract procurement for minority-owned businesses, including House Reports in the 1970s and 1980s and a D.C.

---

[8] Defendants also raise as a compelling interest in "ensuring [the federal government']s funding is not distributed in a manner that perpetuates the effects of either public or private discrimination." Resp. 17, ECF No. 9. But Defendants never revisit this theory after asserting it. *See id.*

District Court case discussing barriers for minority business formation in the 1990s and 2000s. *See* Resp. 17–18, ECF No. 9 (citing *DynaLantic*, 885 F. Supp. 2d at 257–62). Assuming *arguendo* that the evidence is relevant, even the case cited by Defendants recognizes the well-established principle about the industry-specific inquiry required to effectuate Section 8(a)'s standards:

> The fact that Section 8(a) is constitutional on its face, however, does not give the SBA . . . or any other government agency carte blanche to apply it without reference to the limits of strict scrutiny. Rather, agencies have a responsibility to decide if there has been a history of discrimination in the particular industry at issue . . ..

*DynaLantic*, 885 F. Supp. 2d at 282 (quoting *Cortez III Serv. Corp. v. Nat'l Aeronautics & Space Admin.*, 950 F. Supp. 357, 361 (D.D.C. 1996). Thus, the Court looks to Defendants' industry specific evidence to determine whether the government has a "strong basis in evidence to support its conclusion that remedial action was necessary." *See Croson*, 488 U.S. at 500.

According to Defendants, "Congress has heard a parade of evidence offering support for the priority period prescribed by ARPA." Resp. 19, ECF No. 9. Among these:

- A House Report specifically recognized that "underlying racial, wealth, social, and gender disparities are exacerbated by the pandemic," that "[w]omen – especially mothers and women of color – are exiting the workforce at alarming rates," and that "eight out of ten minority-owned businesses are on the brink of closure." H.R. Rep. 117-7, at 2 (2021);

- Expert testimony describing how "[b]usinesses headed by people of color are less likely to have employees, have fewer employees when they do, and have less revenue compared to white-owned businesses" because of "structural inequities resulting from less wealth compared to whites who were able to accumulate wealth with the support of public policies," and that having fewer employees or lower revenue made COVID-related loans to those businesses less lucrative for lenders. *See Paycheck Protection Program: Loan Forgiveness & Other Challenges: Hearing Before the H. Comm. on Small Bus.*, 116 Cong. 10, June 17, 2020);

- Expert testimony explaining that "businesses with existing conventional lending relationships were more likely to access PPP funds quickly and efficiently," and that minorities are less likely to have such relationships with lenders due to "pre-existing disparities in access to capital" *See Paycheck Protection Program: Loan Forgiveness & Other Challenges: Hearing Before the H. Comm. on Small Bus.*, 116 Cong. 10, 59–60 (June 17, 2020);

- House Committee on Small Business Chairwoman Velázquez's evidence offered into the record showing that "[t]he COVID-19 public health and economic crisis has disproportionally affected Black, Hispanic, and Asian-owned businesses, in addition to women-owned businesses" and that "minority-owned and women-owned businesses were particularly vulnerable to COVID-19, given their concentration in personal services firms, lower cash reserves, and less access to credit." *See* July 15, 2020 Memo. at 4-5 (citing Robert W. Fairlie, *The Impact of COVID-19 on Small Business Owners: Evidence of Early-Stage Losses from the April 2020 Current Population Survey*, NBER (June 2020), https://www.nber.org/papers/w27309);

- Witness testimony that emphasized the "[u]nderrepresentation by women and minorities in both funds and in small businesses accessing capital" and noted that "[t]he amount of startup capital that a Black entrepreneur has versus a White entrepreneur is about 1/36th." *Long-Lasting Solutions for A Small Business Recovery: Hearing Before the Comm. on Small Bus.*, 116 Cong. 6, 16 (2020);

- Studies pre-dating COVID-19 that explain "[g]ender and race influence small business owners' ability to access credit." Brown, Kenyon, Robinson, *Filling the U.S. Small Business Funding Gap* (Feb. 2020);

- Other expert testimony noting that in many cases, minority-owned businesses struggled to access earlier COVID relief funding, such as PPP loans, "due to the heavy reliance on large banks, with whom they have had historically poor relationships." *Long-Lasting Solutions for A Small Business Recovery: Hearing Before the Comm. on Small Bus.*, 116 Cong. 6, 10 (2020) (statement of Dr. Lisa D. Cook).

- Evidence presented at other hearings showing that minority and women-owned businesses lack access to capital and credit generally, and specifically suffered from inability to access earlier COVID-19 relief funds and also describing "long-standing structural racial disparities in small business ownership and performance." *See, e.g.*, *Supporting Small Bus. & Minority-Owned Bus. Through the Pandemic*: *Virtual Hearing Before the Subcomm. on Nat'l Sec., Int'l Dev., & Monetary Policy of the H. Comm. on Fin. Servs.*, 117th Cong. 60 (Feb. 4, 2021); and

- A statement of the Center for Responsible Lending describing present-day "overtly discriminatory practices by lenders" and "facially neutral practices with disparate effects" that deprive minority-owned businesses of access to capital. *See, e.g.*, *Supporting Small Bus. & Minority-Owned Bus. Through the Pandemic*: *Virtual Hearing Before the Subcomm. on Nat'l Sec., Int'l Dev., & Monetary Policy of the H. Comm. on Fin. Servs.*, 117th Cong. 70 (Feb. 4, 2021).

This evidence largely falters for the same reasoning outlined above—it lacks the industry-specific inquiry needed to support a compelling interest for a government-imposed racial classification. While the Court is mindful of these statistical disparities and expert conclusions based on those disparities, "[d]efining these sorts of injuries as 'identified discrimination' would give . . . governments license to create a patchwork of racial preferences based on statistical generalizations about any particular field of endeavor." *Croson*, 488 U.S. at 499; *see also Adarand*, 515 U.S. 200 (extending *Croson*'s holding to the federal government). "Racial classifications are suspect, and that means that simple legislative assurances of good intention cannot suffice." *Id.* at 500.

Thus, the Court concludes that the government has failed to prove that it likely has a compelling interest in "remedying the effects of past and present discrimination" in the *restaurant* industry during the COVID-19 pandemic. For the same reason, the Court finds that Defendants have failed to show an "important governmental objective" or "exceedingly persuasive justification"[9] necessary to support a sex-based classification. *See* Resp. 24, ECF No. 9. Having concluded Defendants lack a compelling interest or persuasive justification for their racial and gender preferences, the Court need not address whether the RRF prioritization program is narrowly tailored or substantially related to those particular interests. Accordingly, the Court concludes that Plaintiffs are likely to succeed on the merits of their claim that Defendants' use of race-based and sex-based preferences in the administration of the RRF violates the Equal Protection Clause of the Constitution.

---

[9] The government must show the sex-based classification "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

### B. Substantial Threat of Irreparable Harm

Plaintiffs contend that they "will suffer irreparable harm absent a TRO because the entire $28.6 billion that Congress appropriated is likely to be depleted before Mr. Greer's application is eligible for consideration." TRO Mot. 6, ECF No. 6. Defendants respond that its standing argument about lack of injury-in-fact *ipso facto* precludes a finding of irreparable harm. *See* Resp. 24, ECF No. 9. To show immediate and irreparable harm, Plaintiff must demonstrate he is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "[H]arm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey*, 647 F.3d at 600. However, "the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Id.* An injunction is appropriate only if the anticipated injury is imminent and not speculative. *Winter*, 555 U.S. at 22.

Defendants maintain that, "because the appropriated RRF funds will almost certainly be exhausted even if Greer now files an application, his claim of harm is practically moot." Resp. 24, ECF No. 9. The Court agrees with Defendants' premise that, as currently positioned, "Greer now possesses no plausible likelihood of obtaining RRF dollars." Resp. 25, ECF No. 9. Indeed, Defendants have all but guaranteed that irreparable harm will occur by way of the SBA not processing or considering an application filed by Greer, absent a TRO. *See* Press Release 12-36, U.S. Small Bus. Admin. But Defendants' assumption that a TRO will not cure the alleged harm is misplaced and largely irrelevant to whether the irreparable harm exists.

Accordingly, the Court concludes that Plaintiffs will suffer irreparable harm absent a TRO because Plaintiffs are experiencing race and sex discrimination at the hand of government officials and the evidence submitted by Plaintiffs indicates that the entire $28.6 billion in the Restaurant Revitalization Fund may be depleted before Plaintiffs' application can be considered for relief

under the program. These injuries are also irreparable in light of Defendants' sovereign immunity, and Plaintiffs' inability to seek damages.

### C. Balance of Hardships and the Public Interest

The Court next considers whether the threatened injury to Plaintiffs outweighs any damage the proposed TRO may cause Defendants and its impact on the public interest.[10] Plaintiffs argue that "[t]he harm to the plaintiffs (and others who are being excluded from the Restaurant Revitalization Fund on account of their race and sex) outweighs any 'harms' that might arise from the proposed TRO" and that protection of constitutional rights is always in the public interest. TRO Mot. 7, ECF No. 6. Defendants disagree, maintaining "to enjoin operation of critical parts of the RRF as crafted by Congress [will] likely delay[] the disbursement of critical funds to both priority and non-priority restaurants at a critical moment in the economic recovery from COVID-19." Resp. 25, ECF No. 9. Defendants' contention is predicated on a broad-sweeping TRO. A narrow TRO resolves any threat of delay. Thus, the Court concludes that the balance of equities and the public interest favors Plaintiffs.

### D. Bond

Rule 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any part found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The amount of security required "is a matter for the discretion of the trial court," and the Fifth Circuit has held district courts have discretion to "require no security at all." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (citing *Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d

---

[10] The Court considers the balance of hardships and public interest factors together as they overlap considerably. *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *aff'd*, 136 S. Ct. 2271 (2016).

300, 303 (5th Cir. 1978)). In determining the appropriate amount, the Court may elect to require no security at all. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996); *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 235 (S.D. Tex. 2011) (citing *EOG Resources, Inc. v. Beach*, 54 F. App'x 592 (5th Cir. 2002)). The Court finds no evidence that Defendants will suffer any financial loss from a TRO, so there is no need for Plaintiffs to post security in this case.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiffs have met their burden of proving each of the four elements for a temporary restraining order. *See* Fed. R. Civ. P. 65(d). Accordingly, the Court **GRANTS** Plaintiffs' Motion for Temporary Restraining Order (ECF Nos. 5–6), **DIRECTS** Plaintiffs to file their application for an RRF grant on or before **May 19, 2021, at 5:00 p.m.**, and **ENJOINS** Defendants Isabella Casillas Guzeman and the United States Small Business Administration, and their officers, agents, servants, employees, attorneys, designees, and subordinates, as well as any person acting in concert or participation with them to process and consider Plaintiffs' application for an RRF grant as of May 13, 2021, the date of the Complaint was filed.[11]

A preliminary-injunction hearing will be held on **May 24, 2021, at 9:00 A.M**. in the Eldon B. Mahon Courthouse, 501 W. 10th Street, 5th floor courtroom, Fort Worth, Texas. Counsel for

---

[11] Plaintiffs requested the following injunctive relief:

> from discriminating on account of race and sex in administering the Restaurant Revitalization Fund, as it relates to Plaintiff's application. This prohibition on discrimination encompasses (a) "Prioritizing" application according to the race or sex of the applicant; (b) Considering or using an applicant's race or sex as a criterion in determining whether an applicant will obtain relief from the Restaurant Recovery Fund; and (c) Allowing any application that was previously "prioritized" on account of the race or sex of the application to keep or maintain that priority over applications.

To the extent Plaintiffs still seek relief of this scope, they should brief the need for this relief.

both parties are **ORDERED** to attend. Counsel are further advised that they should be prepared to answer questions and discuss all issues currently pending before the Court.[12]

**SO ORDERED** on this **18th day** of **May, 2021, at 8:57 P.M. central time**.

*[signature]*
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

---

[12] The Court recognizes the limited time period in which the parties produced their briefing, and Plaintiff will carry the burden at the preliminary injunction hearing to justify a continued injunction.